Case number 2014-3041, ASK Chemicals, L&D, v. Computer Packages, Inc. You may proceed to 15 minutes per side. Proceed to panel until you are done. May it please the Court, my name is Jeff Stanley. I'm here on behalf of ASK Chemicals, LP. I have reserved three minutes for rebuttal. You may, thank you. Your Honors, this case concerns the loss of a Japanese patent that was owned by ASK Chemicals. There is little dispute, in fact no dispute, about how that happened. We're here today about the exclusion of an expert witness that ASK Chemicals hired to present evidence in this case about lost profits that resulted from the loss of the Japanese patent. I want to point out where I believe the District Court made certain mistakes that I believe were an abuse of discretion. There were essentially five findings by the District Court, two of which favored our client. The first one was the expert's qualifications. The District Court found that Mr. Russell was qualified to serve as a damages expert in this case. The second thing the Court found was that Mr. Russell's methodology using a present value calculation based on a discounted cash flow method was also something the Court did not have any problem with. So that gets to the three things that the Court did not like and thought that there was too big of a gap between Mr. Russell's information that he relied upon and his conclusions in this case. The first one was time. The Court felt that there was too much of a gap in years because one of the references that Mr. Russell relied on was a 1998 market survey. Second, the Court found that there was too big of a gap in geography that Japan, where this patent was lost, was not necessarily connected to the European market or the U.S. market for these products. And the third problem that the Court had with Mr. Russell's findings was that he relied to some extent on input from ASK Chemicals. I'd like to address each of those three items. First of all, with respect to time, yes, Mr. Russell did look at a 1998 market survey, but he also considered ASK's actual sales figures for the products in question from 2005, I believe, through 2011. So he was looking at actual sales figures in Europe and in the United States. So he didn't just rely on 1998 information. He actually had actual sales figures from ASK Chemicals. As to geography, when the Court was concerned that Japan is not Europe or Japan is not the U.S., we would submit, Your Honors, that castings, which are the technology we're talking about here, metal castings, are castings wherever you are in the world. Automobiles, trains, and so forth are made using castings. Isn't the issue, in effect, the competition? That is, as I understand the methodology, and correct me if I've missed the math, basically, he said, in Japan, this Fosico company has 25 percent of the market. In other parts of the world, we do 40 percent, 38 percent, as well as Fosico does. So 38 times 25 is 9 or 10 percent, and that's why I project 10 percent of the Japanese market. Is that a fair understanding of that part? It's generally fair, Your Honor, yes. And so the question then is that I think it's pretty clear that in different places in the world, these different companies have different shares, as I think there's some other company that has 70 percent in Japan, and he doesn't compare it to that company. And why you would think that if you go into a new market, you should get the same kind of share relative to one competitor. That just seemed to be where the biggest disconnect was to me. Actually, Your Honor, with Fosico, and by the way, I'd like to point out that they're a worldwide company. They don't sell just in Japan. Right. Well, they have to be because you're comparing their sales to your sales in these other parts of the world, right? That's where you get the 38 percent as good as Fosico. Yes. Okay. And I will also say that the ASK Chemicals thought in their projections they could achieve a 15 percent market share in Japan, and the expert in this case said, I don't think so. I don't think you're going to get that high. I think it will only reach 10, and did not immediately grasp 10, and said that 10 would come over time, and actually started with a much lower percentage in the early years of the remaining life of this patent, which would have expired in 2017. But I think Fosico is important here for a couple of reasons. Number one, Fosico does sell in Japan, and sells in 30 countries around the world according to their website, which the expert did cite to their website. There's been criticism that he only looked at information from ASK Chemicals. That is not correct. He did look at information they provided. He also looked at Fosico's website. He also looked at the Modern Castings Census from 2010, a magazine that looked at the Japanese market. And the fact that Fosico is able to have sales in Japan, we believe, is evidence that ASK Chemicals could have sales in Japan, and I'll tell you why. We do trail Fosico, who's larger than us, a bigger market player than us. We do trail them in other regions of the world. We do believe that if they're selling in Japan, we can reach similar market shares in Japan. Because even though their name sounds Japanese, it's not a Japanese company. This other Japanese company has 70% of the market. We estimate that Miowa has 70% of the market share. That's correct. Did Fosico have a factory in Japan? I do not know that. Their plan was to have a factory in China and to import it into Japan, right? That's correct, Your Honor. We felt that the most economic way to get into the Japanese market would be through a factory in Japan after our factory burnt down in 2000. There was some discussion about how favorable the Japanese were going to be to allowing those kinds of imports. That's why I was interested in whether Fosico had a factory there. But I think the key point is that they do operate there, they do have sales there, and that is an important fact here. The failure to pay by the defendant was in January of 2010. Correct, Your Honor. Was your company, ASK, selling these sleeves, riser sleeves, in 2008, 2009 in Japan? Essentially, no, Your Honor. The sales started back in, I believe it was 1999 in Japan when we first introduced the product there. There was a fire at your factory? Correct. There was a fire in 2003 and the predecessor entity, Ashland, just decided, let's focus our efforts on Europe and the United States right now. ASK has never had a history of profitable sales in Japan? That is correct. Under Ohio law, which governs here, I gather you have to show lost profits to a reasonable certainty, don't you? Yes. I believe, Your Honor, that the reasonableness standard here needs to be considered in view of the facts of each case. In this case, this is a worldwide market for castings, and we're talking about Japan. It would have been very, very difficult to get the Japanese companies to come to the United States and say, I would have purchased ASK Chemicals products had this patent not expired. It's almost an impossible task. Let me ask you another question. What you're complaining about is that, hey, they didn't renew the patent, which they had conceived, they goofed up and didn't renew it in Japan. That wouldn't have prevented ASK from selling its castings in Japan. All it would have done is excluded competition from copying your patent design. Is there any evidence that you would have... Why didn't ASK just start trying to sell its riser castings in Japan anyway? We are, Your Honor. ASK Chemicals does have a Japanese entity that is attempting to sell riser sleeves in Japan. It has not been met recently with much success. We believe, without, honestly, any evidence to back this up, we believe it's because the patent has been lost. We can't seem to get a foothold in Japan at this point. Is there any evidence that somebody else is selling risers using your patented whatever was protected? Is that a technology or an item or both? It's both, Your Honor. We're not entirely certain of that. There was evidence from one of the executives, Mr. Horvath, who testified in his deposition that Fosico, ASK believed Fosico had been copying or attempting to get close to our technology in other countries. Do we have evidence of that in Japan? No, we don't, but Fosico is in Japan. In addition, is your riser sleeve that used this patent, are there other patents involved? I mean, a lot of times you have a product and there are three or four patents, and even if one of them doesn't exist, they can't really copy because they're protected by the others. Yes, thank you, Your Honor. In this case, I believe there's five or six total patents that relate to this technology. The key about the 168 patent that expired here is that it was the grandfather, if you will. It was the essential technology. The other five are essentially add-ons or improvements thereto. So you could infringe the 168 patent, could have infringed the 168 patent before it expired, without infringing the other five. That would mean then you couldn't use the improvements that you're still patented. Is that correct? Correct. I see that my time has expired. Your time has expired. You'll have your time for rebuttal. Thank you. Good morning, Your Honors, and may it please the Court, Jacob Cohn for the Appellee Computer Packages, Inc. Mr. Russell was a perfectly well-qualified net present value cash flow number crunching expert. This case is not about whether or not he was qualified to do those tasks. The issue is whether or not the assumptions that he was given were sufficiently reliable to permit him to draw the conclusions that he drew. He is an expert who is used to taking real figures, real sales figures, and crunching them. And we've just had a long discussion about the fact that there are no sales figures for Japan. So there were two sources of information fundamentally that the District Court found to be The question wasn't whether or not he's a miller. The question is whether or not the grist was sufficient to permit him to mill it and to declare a number of damages. The two issues are the 1998 plan fundamentally, which was a gee whiz, we would like to be able to go sell, and we hope that we will have sales figures of X by sometime in the 2000s. The actual facts, of course, are they went in there on a very limited basis, started with limited sales. Nobody knows if they were profitable. There was a fire at the toll producer, the company that paid in Japan to manufacture this, and they went home for years and years. And then around the time that CPI mistakenly failed to renew the patent, they got interested in going to Japan again. And the question is whether or not the District Court abused its discretion in saying, your, you know, precatory wishful figures from 1998, and something they refer to as a market survey, which is nothing of the sort, and if the court wants to look it up, the citation is in my brief. It's a piece of paper, it's like you wrote on the back of a napkin, and at the top it says guesses. And the deposition testimony confirms these were guesses. This is not the sort of basic, reliable information that an expert is permitted to use in formulating an opinion. This is not like the recent Sixth Circuit cases where there have been reversals of summary judgment because the District Court didn't like the answer, thought the answer was a little too far afield. There's some antitrust cases. There's the one case that they cite where there was a future economist, an economist talking about future earnings capacity, and it was a daycare worker. And the expert said, well, she might not always be a daycare worker when her children are older. She might go back to being, you know, an executive assistant somewhere. That's not this case. This is basic Daubert-Cumo. This is basic. Is the stuff that an expert, albeit an expert in something, is it sufficiently reliable to permit him to give testimony? I think there's not a real serious... What you call the market survey that you were deriding there, is that the information on the current market shares around the world? That's the 2011... That gets to the second issue, if I could just refocus Your Honor's question. The second issue that I take issue with, and that the court took issue with below, is the comparison of markets in other parts of the world and the sales there, because there are hard sales figures there, concededly. But the point was... I agree with getting to that argument. I just want to know, when you used the word market survey that you said was just guesses, were you referring to that or were you referring to some other... I'm referring to... Literally, it's almost like somebody wrote on the back of a napkin. Do you have a record entry number for which one you're talking about? Absolutely, Your Honor. Just give me one second. It's on page 40 of my brief, Your Honor. It's the so-called Japanese survey, which is captioned, Yes, above all the figures. And that's RE 46-12 at page 3335. Okay, thank you. Okay, but the larger question, I don't want to get lost in the weeds here. There are two fundamental sets of data that the district court found were insufficient to permit this number-crunching expert to crunch up the numbers. And they were guesses and projections from 15 years ago as to what sales in Japan might be. And I'm happy to answer any questions with respect to why the court might have questions as to whether or not that was an appropriate use of the court's discretion to say you can't testify based upon that. And then the second issue is whether or not European and American sales of a company whose home bases are Europe and America are a valid comparator to sales in a country, Japan, that Mr. Standley conceded an oral argument below is notoriously difficult to break into. We only have to go back to Admiral Perry in 1854 to understand that Japan is a unique market. And again, this expert, who admittedly had no expertise in Japanese markets, in valuing patents, he was completely dependent upon the information he was given. And he was not capable of critically analyzing it. He did not have any pretense to an expertise that would enable him to do so. So the court, again, in the exercise of its broad discretion, said you have not given me anything to logically link these sales in other parts of the world to this unique market, which is Japan. And again, I... Were other foreign companies selling a similar product in Japan at that time? Well, there were... In a relevant time frame? Three companies had 100% of the market. One of those companies developed a look-alike product. But were these foreign companies, foreign to Japan, that were selling in Japan? My understanding is one of them was and two of them weren't. Fosico. Fosico is not a Japanese company. They had 25% of the market. The others were Japanese companies. The broader point is that Mr. Russell had no basis and did not pretend to have a basis to offer an opinion as to the comparability of the markets or as to the ability to penetrate the market. He looked at... For example, if he had said, you know, I also am an expert in worldwide marketing and Fosico came in five years ago and in five years they got 25% of the market. If he had... That might have helped. A worldwide student of the economies and business practices of countries. And he said, you know what, Japan is part of... It's in my wheelhouse. I might focus on North America, but I know enough about Japan to give an opinion. You might be in a situation where you are with, you know, in cases where that's an issue of weight and credibility for the fact finder. But here you don't have an expert who says, I know how to do this. You have an expert who sat there at a Daubert hearing and admitted under examination by the district court. No, that's not what I do. I looked at this. It looked reasonable. But there's no basis for him to say it looked reasonable. There's no basis for him to have said, no, it wasn't 15%. It was 10% other than by the seat of his pants. And by the seat of his pants is not what an expert witness does. It's he's no better than a lay juror, which brings me to the other point, if I may. Before you get into that, let me just ask you. You did not, your client did not retain an expert to counter Mr. Russell. Is that correct? I do not believe that. There was an expert. He did not put forth a number. He did not attempt to, you know, bear their burden of proof by putting forth a number. Well, he didn't testify. Well, you may have had an expert that you consulted with, but he didn't testify and didn't offer an expert witness report. There was an expert who was deposed, but he's not really part of this record because the record here is whether or not they've met their burden of proof to prove that there is a material issue of tribal fact, which is what I'd like to turn to next. Well, it could be relevant if that expert's testimony and opinion was compared to or used to critique Mr. Russell's opinion, but you didn't do that. None of that's in this case. Is that right? That's not in this record, no, Your Honor. It's not part of the summary judgment record and part of really what's up here on appeal. I mean, there was an expert. Frankly, I'm appellate counsel. I didn't really study very closely what he had to say because it wasn't particularly relevant to this appeal, to the extent that there's an issue. Well, it's relevant insofar as you're claiming that Russell's testimony was defective, and that's an issue in the case. Well, sure. We did not bring in a Japanese expert, a Japanese business expert. We didn't do anything like that. But the issue then becomes if the court properly excluded Mr. Russell from testifying, is there anything left here? And we suggest that, as set forth in the brief, a fortiori there is not. If this information with none of this is admissible, all of this is hearsay, there's multiple layers of why this is not competent evidence, the information that he relied upon, it obviously cannot go to a jury. And the fact that the court found that it was insufficient for an expert to testify about is pretty much dispositive of the issue of whether or not it creates a genuine issue. And I would suggest that the only issue, again, even on that level, is whether or not the court, in its discretion, appropriately ruled that there was an insufficient connection between the European and American sales figures, which are real, and the Japanese market, such that it would be permissible to just lay them out in front of a jury and say, you know, make the comparison. That there was no linkage, there was no evidence of linkage that these unrelated markets are valid comparators. And subject to any further questions, Your Honor, I would cede my time. Okay, thank you, Counsel. Thank you, Your Honor. Mr. Stanley, you have three minutes for rebuttal. And just to start with, did you have any evidence at all about how Fosico got into the market and what their timing and rise in sales, that sort of thing, was? We do not, Your Honor. I would like to point out that by its very nature, future revenues, especially in a country where you're not presently selling, are speculative. And the courts have not necessarily excluded testimony because future revenues are speculative. Your Honors ask Counsel about their expert. I'd like to talk about that for just a second. In a sense, they have unclean hands. Because of the loss of the patent, they've put us in this position. We didn't ask to be in this position. Because of the loss of the patent, we had to find a methodology to try to ascertain what the lost profits would be because of the loss of that patent. They chose not to do it. And I think the reason they chose is because it's difficult. We came up with a way to do it, and we believe that way is reasonable considering all the circumstances. I would also point out that ASK Chemicals was making sales in Japan before the fire back in 2003. So it's not that we never were there. We've been there. Now we're trying to get back in. Do you know what the percentage of the market was before the fire? It was very small, Your Honor, and I will tell you why. Let me ask you a question legally about Dawbert because we've come up with this thing about whether they had an expert. Do you have any law? My impression was Dawbert hearings generally are not dueling experts. That's at the summary judgment stage or at the trial stage. Dawbert is, is your expert standing alone good enough to get in? And presumably if they had wanted to get their expert in at the summary judgment, they could have been a Dawbert hearing on that side. But am I wrong? That is, are Dawbert hearings usually dueling experts or is your expert good enough to stay in the game? I believe you're right, Your Honor. It's not dueling experts in Dawbert. But I will say with respect to Dawbert, and I'm glad you mentioned that, I have just a few seconds left, that the weight of the evidence should not be weighed by the district court. The methodology, the qualifications, yes, but I believe Dawbert indicated that the district court shouldn't get into the weighting game of how credible is this evidence. You use the word methodology as one of the things that was okay, but that's the net present value, what he calls the number crunching. The methodology of how you get the numbers to put into the crunching is really the crux of this case, isn't it? That is, how good, how expert are the numbers that are then put into the undoubted net present value calculation? You're correct, Your Honor. I don't disagree with that. I realize my time's out. I'd like to make just one closing point, that even if the district court was right to exclude the expert, there is evidence in this case, licenses in Europe, sales in different parts of the world, that a reasonable jury could conclude that we could make sales in Japan. Thank you. I know you're out of time, but just one last question here. Since your opponent didn't put forth an expert or any expert testimony, I'm assuming that they also did not provide an alternative calculation of profits, lost profits, to your expert's calculation. There's no proposal that they promulgated for the district court's consideration as the district court deliberated to decide whether to exclude your expert. Is that right? That's correct, Your Honor. I think it goes to the point that we have a property that was lost, and that property's worth something, and they didn't even put forth a number of what that something was. Even if it was just $50,000, they didn't put it forth. And I think that's detrimental. All right. Thank you. Did you try to get back, or did you get back the fees that you paid them for the stuff they didn't do? I believe they did return that, Your Honor. Thank you, counsel.  The case will be submitted, and the clerk may call the roll.